Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Geraldine Soat Brown | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 9620 | **DATE** | 2/21/2003 |
| **CASE TITLE** | | Reynolds vs. Barnhart | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   For the reasons set out in the Memorandum Opinion and Order, Defendant's motion for summary judgment [24-1] is denied; Plaintiff's motion for summary judgment [20-1] is granted and the case is remanded to the Commissioner of Social Security for proceedings consistent with the Opinion.

(11) ☐ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | | | | | **Document Number** |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | |
| | No notices required. | | number of notices | | |
| ✓ | Notices mailed by judge's staff. | | FEB 2 4 2003 | | |
| | Notified counsel by telephone. | | date docketed | | |
| | Docketing to mail notices. | | docketing deputy initials | | |
| | Mail AO 450 form. | | 2/21/2003 | | |
| | Copy to judge/magistrate judge. | | date mailed notice | | |
| MW | courtroom deputy's initials | | MW | | |
| | | | mailing deputy initials | | |

Date/time received in central Clerk's Office

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

**DOCKETED**

FEB 2 4 2003

| | | |
|---|---|---|
| NORA REYNOLDS, | ) | |
| Plaintiff, | ) | **Cause No. 01 C 9620** |
| | ) | |
| v. | ) | **Magistrate Judge Geraldine Soat Brown** |
| | ) | |
| JO ANNE BARNHART, | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Nora Reynolds brought this action pursuant to 42 U.S.C. § 405(g) for judicial review

of the decision of the Commissioner of Social Security denying her application for supplemental

security income benefits under the Social Security Act, 42 U.S.C. § 1381 *et seq.* [Dkt # 1.] The

Commissioner denied Plaintiff's application for disability benefits initially and on reconsideration.

(R. 374, 379.)[1]  Plaintiff requested and received a hearing before an administrative law judge

("ALJ"), who remanded the case to the Commissioner pursuant to 20 C.F.R. § 416.920a(e)(3), which

provides for remand to allow the Social Security Administration ("SSA") to evaluate the claimant's

mental impairments. (R. 424.) After additional reports were received, the Commissioner again

denied Plaintiff's claim. (R. 430.) Following that denial, Plaintiff again requested a hearing before

an ALJ. (R. 436.) A different ALJ was appointed, who held two hearings in 1999. The first hearing,

on August 13, 1999, was terminated when Plaintiff became upset and began to cry. (R. 295.) The

---

[1]"R." refers to the certified record of proceedings, evidentiary documents, and
administrative hearing transcript prepared by the Social Security Administration's Office of
Hearings and Appeals pursuant to 42 U.S.C. § 405(g).



second hearing, which completed the testimony, was held on September 29, 1999. (R. 298-370.)[2] Following those hearings, the ALJ rendered an unfavorable decision. (R. 28.) After the Appeals Council of the Social Security Administration's Office of Hearings and Appeals ("Appeals Council") declined Plaintiff's request for review,(R. 8), Plaintiff timely filed the present action. The parties have filed cross motions for summary judgment under Fed. R. Civ. P. 56, [dkt## 20, 24], and have consented to the jurisdiction of a magistrate judge under 28 U.S.C. §636(c)(1). [Dkt## 11, 12.] Thus, the decision of this Court constitutes the final ruling on the cross-motions. For the reasons set forth below, Defendant's motion for summary judgment is DENIED. Plaintiff's motion for summary judgment is GRANTED, and the case is remanded to the Commissioner for proceedings consistent with this opinion.

## FACTUAL BACKGROUND

At the time of the 1999 hearings, Plaintiff was forty-six years old. (R. 269.) She has an eleventh grade education and a GED. (R. 271.) She was certified as an Illinois Certified Nurses Aid. (*Id.*) Plaintiff worked as a nurses aid for six months in 1984. (R. 277-279.) She states that the program was phased out, she was fired and that she no longer wanted to work where she was working. (R. 310.) After that she worked as a waitress, a babysitter and with geriatric patients, always for cash and never for more than three months at a time. (R. 279-280.) On September 2, 1989, Plaintiff was involved in an auto accident. (R. 826.) She suffered a broken clavicle and other injuries. (R. 280.) Plaintiff alleges that her disability began on that date. (R. 478.) Plaintiff suffers from chronic lower back pain and depression. (*See, e.g.,* R. 766, 620.) Since the claimed onset of

---

[2]The ALJ's opinion states that the second hearing was held on September 22, 1999. (R. 14.) That was the date for which the second hearing was scheduled. (R. 297.) Apparently, the hearing was continued at Plaintiff's request (R. 369), and held on September 29, 1999. (R. 298.)

disability, Plaintiff has watched children after school and worked as a companion for sick relatives and friends. (R. 274, 276.) Plaintiff's daughter died in 1991. (R. 728.) Plaintiff testified that she is the legal guardian and caretaker for her grandson, who was nine years old at the time of the hearing. (R. 270, 304.)

## A. EVIDENCE CONCERNING BACK PAIN

Following the 1989 car accident, Plaintiff suffered from neck pain and paresthesia[3] in both hands. (R. 826.) Six months after her accident, after being treated "extensively" and "conservatively" by her doctor, she underwent surgery[4] to treat her neck pain. (*Id.*) She also apparently underwent a decompression of her ulnar nerve[5] to treat the paresthesia. (R. 153, 154.) Following the surgery to her neck Plaintiff's neck pain was alleviated. (R. 153.) At the time of the hearing she suffered lower back pain and some weakness in her hands. Plaintiff reported, for example, that she is unable to type. (R. 290, 311.) Plaintiff characterized her back pain as continuous and stated that the pain limited her range of activities significantly. (R. 532, 534.) Plaintiff testified that if she remains in one position for an extended period she is in pain and needs to "twist and turn." (R. 282-283.) She testified that on a good day she can stand unsupported for only about five minutes and can walk only

---

[3] Paresthesia is an abnormal sensation such as burning or tingling. *Stedman's Medical Dictionary* ("*Stedman's*") 1316 (27th ed., Lippincott Williams Wilkins 2000).

[4] This operation is referred to by several different names in the record. The hospital report of the operation refers to it as an "anterior cervical diskectomy and inter-body fusion (C5, C6) with iliac allografft." (R. 146.) The medical expert refers to it as a "cervical fusion." (R. 331.) The ALJ refers to it as a "surgical fusion of the cervical spine." (R. 17.) Plaintiff refers to it as a "spinal fusion." (R. 280.) A diskectomy is the excision of some or all of an intervertebral disk. *Stedman's* at 508.

[5] The ulnar nerve runs the length of the arm to the forearm and hand. *Stedman's* at 1202.

three blocks. (*Id.*) She states that "[b]ending and [straighten]ing up can be a shocking pain," (R. 532), and that she has difficulty caring for her grandson and completing household chores. (R. 534.)

Plaintiff has been treated by several physicians and institutions for her back pain. Plaintiff has been seen by Dr. Ekwuome and others associated with Provident Hospital (R. 633-657), by physicians and others at Holy Cross Hospital (R. 619-632), and St. Bernard's Hospital (R. 659-726), by Dr. Owens and Dr. Smith of the Mid-South Clinic (also referred to as the Mid-South Physician's Group) (*e.g.*, R. 166-168, 832-834), by physicians and others at Cook County Hospital's Fantus Clinic (R. 583-595), and by Dr. Isaac Martin Thapedi, a neurosurgeon. (R. 151-156, 765-766.)

Plaintiff visited the Mid-South Physician's Group twenty-two times between 1990 and 1993 for spinal problems, depression and other health issues. (R. 165-166.) Plaintiff made no visits in 1994 or 1995. Between 1996 and 1999 Plaintiff made twenty-one visits complaining of depression, back pain, muscle spasms and other health issues. (R. 165-168.)

Plaintiff visited the Fantus Pain Clinic of Cook County Hospital from December, 1995 to September, 1996. (R. 584-594.)[6] The clinic staff noted in 1995 that Plaintiff was in "moderate distress." (R. 594.) A spine lumbar flexion exam[7] in 1996 displayed "longstanding DJD [degenerative joint disease][8] . . . but no instability seen." (R. 589.) The neurosurgery clinic

---

[6]Dr. William Stark, who testified as a medical expert at Plaintiff's first hearing before an ALJ, stated that a pain management clinic "basically tries to teach the person how to get along with their pain, although they will at times try to do things to alleviate it." (R. 249.)

[7]Lumbar flexion refers to the flexing or bending of the part of the back and sides between the ribs and the pelvis. *Stedman's* at 686, 1034.

[8] Degenerative joint disease is a form of arthritis. Dan J. Tennenhouse, *Attorney's Medical Deskbook 3d*, Part 2, Chapter 5, Sec. B, §5:3 (2002).

4

recommended that Plaintiff obtain a TENS[9] machine. (R. 584.)

Plaintiff visited Provident Hospital in 1995 and 1996 for outpatient physical therapy and other purposes. (R. 633-657.) The records of these visits indicate chronic muscle spasms (R. 657), chronic lower back pain (R. 656, 653, 645, 642), and lumbar disc disease.[10] (R. 645.) The exact treatment she received is unclear from her records, however she was given repeated prescriptions for Tylenol #3.[11] (R. 641, 642, 645, 647.) She received physical therapy in 1996 but was dropped from the program after she stopped attending. (R. 635-639.) Plaintiff's physical therapy records indicate that she reported a decrease in her back pain. (R. 637.) In 1996, Dr. Karen Ekwuome, one of Plaintiff's treating doctors, wrote that Plaintiff was "physically unable to sit for long periods of time in one place due to lower back pain" from lumbar disc disease and arthritis. (R. 634.) Dr. Ekwuome stated in that note that the note was written at the request of the Plaintiff. (Id.)

Plaintiff visited the Holy Cross Emergency Room on three occasions. In 1994, she was taken to the emergency room after she passed out. The emergency room report listed vasovagal syncope[12] and acute alcohol intoxification as the final impression. (R. 624.) In 1995, she went to the Emergency Room because she ran out of pain medication and could not wait to get more. (R. 630-

---

[9] "TENS" stands for transcutaneous electrical nerve stimulation. *Id.* A TENS unit delivers low voltage current to alleviate pain. *Id.*

[10] Lumbar disc disease is a common cause of chronic or recurrent low back and leg pain. *Harrison's Principles of Internal Medicine,* Vol. 1, 82 (15th ed. McGraw-Hill 2001).

[11] Tylenol #3 is Tylenol with 30mg of codeine, an opium derivate. It is indicated for the relief of mild to moderately severe pain and can be addictive. *Physician's Desk Reference* ("*PDR*") 2507 (57th ed., Medical Economics Company 2003).

[12] Loss of consciousness and "postural tone" caused by diminished cerebral blood flow as a result of the action of the vagus nerve on the blood vessels. *Stedman's* at 1745, 1934.

631.) On that occasion she was assessed with chronic lower back pain and treated with Darvocet[13] and another drug. (*Id.*) In 1996, she visited the emergency room following an argument with her roommate and was diagnosed with acute depression. (R. 619.)

Plaintiff attended forty-one physical therapy sessions at St. Bernard's Hospital between September, 1996 and March, 1997. (R. 182-185.) Plaintiff participated in another eight sessions of physical therapy at St. Bernard's over a two-month period in 1999. (R. 790-792.) Her treatment involved the use of a hot moist pack, ultrasound and therapeutic exercises. (*Id.*) Her physical therapy evaluation noted "significant limitations of motion and weakness on [her] trunk." (R. 790.) Dr. Thapedi, a neurosurgeon, performed Plaintiff's spinal surgery at St. Bernard's (R. 146), and saw her for six follow-up appointments. (R. 151-156.) He saw her again twice in 1997. (R. 765-766.) He noted that, following her surgery, Plaintiff continued to suffer from low back pain and recommended that a post-contrast CT scan[14] and thoracolumbar myelogram[15] of Plaintiff be taken. (*Id.*) He also noted in a letter to Dr. Owens that Plaintiff was in moderate distress and that her pain was aggravated by "prolonged same postures such as sitting or standing and sometimes by coughing or sneezing." (R. 766.) He stated that "she experiences transient improvement with position change." (*Id.*) He noted that she had been prescribed Tylenol #3 and was taking an average of three to four tablets a

---

[13] Darvocet is a painkiller for mild to moderate pain. *PDR* at 3504.

[14] "CT" stands for computed tomography. It involves imaging anatomic information from a cross sectioned plane of the body, with each image generated by a synthesis of x-ray data obtained from many different directions. *Stedman's* at 1842.

[15] A myelogram is a radiographic contrast image of the spinal subarachnoid space and its contents. *Id.* at 1171.

day in addition to Indocin[16] and Robaxin.[17] (*Id.*)

Plaintiff's last documented visit with Dr. Thapedi was in 1998. (R. 764.) He noted that Plaintiff's "symptom complex has not changed much" since her last visit and that Plaintiff was still interested in a new myelogram and CT scan. (*Id.*) In 1998, Plaintiff was taken to the emergency room of St. Anthony's Hospital by ambulance following a muscle spasm in her lumbar area. (R. 795, 797.)

Plaintiff has been treated with a variety of medications. At the August, 1999 hearing, she reported taking Amitriptyline,[18] Methocarbomal,[19] Diflunisal,[20] Celebrex[21] and Zoloft.[22] (R. 291-292, 313.) She was treated with physical therapy in 1996 (R. 635-639), and 1999 (R. 790-92), which included treatment with a TENS unit. (R. 792.) She wears a back brace or corset (R. 330, 334), and has made use of heating pads. (R. 518.)

---

[16]Indocin is indicated for the active stages of mild to severe rheumatoid arthritis, including acute flares of chronic disease, moderate to severe ankylosing spondylitis, moderate to severe osteoarthritis, acute painful shoulder and acute gouty arthritis. *PDR* at 2013.

[17]Robaxin is taken as an adjunct to rest and physical therapy for the relief of discomfort due to acute painful muscular-skeletal conditions. *Id.* at 1294.

[18]Amitriptyline is a drug for the relief of the symptoms of mental depression or to control chronic pain, bulimia, migraine headaches and symptoms associated with multiple sclerosis. *The PDR Family Guide to Prescription Drugs* 216 (6th ed., Three Rivers 1998).

[19] Methocarbomal is the generic name for Robaxin. *PDR* at 1294.

[20] Diflusinal is the generic name for Dolobid tablets. They are indicated for acute or long term treatment of mild to moderate pain, osteoarthritis and rheumatoid arthritis. *Id.* at 1989.

[21] Celebrex is used for the treatment of pain. *Attorney's Medical Deskbook* 3rd at Part 7, Chapter 24, Sec. C, §24:6.

[22] Zoloft is a drug for the treatment of major depressive disorder, obsessive compulsive disorder, panic disorder, post-traumatic stress disorder and premenstrual dyophoric disorder. *PDR* at 2676-2677.

Plaintiff has had several images taken of her spine. In 1990, a CT scan, myelogram and apparently an x-ray, were taken in connection with her spinal fusion surgery at St. Bernard's. (R. 809-810.) These images focused on her cervical spine. The CT scan, taken following the spinal fusion, showed no abnormalities other than the spinal fusion. (R. 809.) In 1995, Plaintiff had an MRI[23] taken at Cook County Hospital. (R. 593.) This MRI identified narrowing of the disc space and disc degeneration in a portion of Plaintiff's spine. (*Id.*) The report of the MRI characterized Plaintiff as having degenerative disc disease and bulging at the L5-S1 level.[24] (*Id.*) A CT scan, also taken in 1995, indicated a degenerative change of the lumbar spine with a diffuse bulging disc at the L5-S1 level of the spine. (R. 646.)

Plaintiff has had three consultive examinations in connection with her application for benefits. In 1996 she was examined by Dr. Dean Thomas Velis, a consultive physician for the Bureau of Disability Determination Services ("DDS"), who conducted an internal medicine consultive examination. Dr. Velis found that Plaintiff's range of motion was within normal limits but that Plaintiff "cried out in pain even while sitting in a chair." (R. 597.) He also noted that Plaintiff had difficulty finding a comfortable position and would periodically get up and flex ninety degrees for comfort. (R. 599.) In 1997, Plaintiff was examined by Dr. George Bridgeforth, also a consultive physician. (R. 736-741.) Dr. Bridgeforth noted that Plaintiff complained of pain and tenderness in her lower back. (R. 737-738.) He diagnosed her with "mild to moderate" degenerative

---

[23] "MRI" stands for magnetic resonance imaging. It involves the use of nuclear magnetic resonance technology to provide a three dimensional image of a patient's nuclei. *Stedman's* at 876.

[24] Degenerative disc disease is the result of injury or degenerative changes to the ligaments surrounding the invertabral disks that leads to the painful extrusion of disk material. Richard Sloane, *The Sloane Dorlond Annotated Medical-Legal Dictionary* 211-212 (West 1987).

joint disease and noted that she could walk fifty feet without a cane. (R. 738.) Plaintiff was most recently examined by consulting physician Dr. Richard Shermer in 1998. (R. 784-789.) Dr. Shermer found "advanced" degenerative disk disease and mechanical pain in the lumbar spine. (R. 788.) However, he also noted that Plaintiff was able to walk an unspecified distance without the use of her cane. (R. 785.) He found that Plaintiff's lumbar spine showed "minimal exertion restriction." (R. 789.) In the course of a 1997 psychological assessment, the consulting psychologist, Dr. Langgut, noted that after two and a half hours of testing it was necessary for Plaintiff to lie on the floor to relieve her back pain. (R. 727.)

Three Residual Functional Capacity Assessments ("RFC's") of Plaintiff were completed by non-examining physicians. Two were done in 1996 by Dr. Hans Evers (R. 609) and Dr. Henry Bernet. (R. 601.) The third was completed in 1997 by Dr. Young-Ja Kim.[25] (R. 755.) All of these RFCs found that Plaintiff could sit for approximately six hours in an eight-hour day. Dr. Young-Ja Kim's RFC also found that plaintiff could perform medium work involving ramps and stairs. A medical consultant's case analysis was completed in 1998 by Dr. Evers. Dr. Evers agreed with Dr. Young-Ja Kim's assessment. He felt that Plaintiff's failure to complete her 1996 physical therapy indicated that her pain was not as severe as she alleged. (R. 782-783.)

Dr. William Newman, a orthopedic surgeon, testified as a medical expert ("ME") at the September, 1999 hearing. (R. 328.) He testified that Plaintiff's physical impairments did not "meet or equal" a listed impairment but would limit her functional capacities. (R. 332.) He stated that Plaintiff could lift weights of twenty pounds only rarely (*id.*), and her walking or standing should

---

[25]The signature is partially illegible but he is so identified by the SSA adjudication officer in the "Summary of Evidence and Agreements." (R. 445.)

be limited to four hours a day. (R. 333.) He stated that "very prolonged sitting on one occasion would not be good." (*Id.*) He testified that Plaintiff's sitting should be limited to about two hours maximum at one time for a total of six hours per day. (*Id.*) He did not agree with the consultive physicians who thought that Plaintiff could to do medium level work. (*Id.*) However, he felt that Plaintiff's description of constant and severe pain was inconsistent with the medical findings. (*Id.*)

## B. EVIDENCE CONCERNING DEPRESSION

Plaintiff testified that she was hospitalized for depression in the early 1980's, although this incident is not directly documented in the record. (R. 294, 732.) Plaintiff also reported that her sister suffers from mental illness. (R. 732.) In 1995, Plaintiff visited the Provident Hospital emergency room due in part to depression. (R. 656.) In September, 1996, she was diagnosed with acute depression after visiting Holy Cross emergency room. (R. 620.) Several of Plaintiff's records from St. Bernard's Hospital refer to Plaintiff's complaints of depression (R. 854, 868), as do her records from the Mid-South Clinic. (R. 165-168.) The record includes a referral for outpatient therapy from Dr. Owens. (R. 169-170.) At the time of the September, 1999 hearing she had been prescribed Zoloft by Dr. Owens. (R. 313.)

A psychological evaluation and a psychiatric evaluation of Plaintiff were conducted by DDS consulting physicians. In September, 1997, Dr. Langgut conducted a two-day psychological assessment of Plaintiff. He concluded that her short term memory was intact and her abstract thought process and judgment in limited settings were adequate. (R. 729.) He speculated that Plaintiff might be "upset, tense, nervous and prone to worry" and concluded that Plaintiff had "areas of impaired judgment and reasoning" and "a tendency to express her emotional concerns through physical

difficulties." (R. 730.) Dr. Nelson conducted a psychiatric review of Plaintiff in October, 1997. Dr. Nelson noted that Plaintiff has been "chronically moderately to severely depressed for a number of years" and suffered from chronic insomnia, frequent crying spells, difficulty concentrating, a low frustration tolerance, irregular appetite, frequent suicide idealation, and a "fairly significant" social withdrawal. (R. 735.) He also noted frequent "paranoid like fears." (R. 732.) He diagnosed Plaintiff with "major depression, recurrent" and "personality disorder, NOS"[26] as well as a history of chronic alcoholism and a past history of marijuana abuse. (R. 734, 348.)

Two Mental Residual Functional Capacity Assessments ("MRFC's") were conducted regarding Plaintiff. In 1997, Dr. Spriegel checked boxes indicating that Plaintiff was moderately limited in her activities of daily living and social functioning. (R. 749.) In response to the form's inquiry about "deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner (in work settings or elsewhere)," Dr. Spriegel checked "often." (*Id.* )[27] He found Plaintiff moderately limit in her ability to understand, remember and carry out detailed instructions or to maintain her attention and concentration for extended periods. (R. 751.) He found no evidence of a somatoform disorder.[28] (R. 747.) A second mental residual functional capacity assessment conducted in 1998 by Dr. Cools also found that Plaintiff was moderately limited in her ability to understand and remember detailed instructions, carry out detailed instructions and maintain attention

---

[26]NOS stands for not otherwise specified. *Attorney's Medical Deskbook 3d*, Part 2, Chapter 5, Sec. B, § 5:3.

[27]This form is similar to the PRFT form completed by the ALJ in 1999, discussed below.

[28]A somatoform disorder is the presence of physical symptoms causing clinically significant distress or impairment that are suggestive of a medical condition that are not explained by that condition or other factors. *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-IV") 445 (4th ed., American Psychiatric Association 1995).

11

and concentration for extended periods. (R. 768.)[29] Dr. Cools also completed a Psychiatric Review Technique Form ("PRTF"). (R. 772.) He did not indicate one way or another whether there was evidence of a somatoform disorder. (R. 777.) In addition, he apparently did not complete that part of the form describing the degree of functional limitation. (R. 779.)

According to Dr. Kaplan, the medical expert who testified at the second hearing, Plaintiff does not suffer from severe depression. (R. 337.) Commenting on Dr. Nelson's conclusion of chronic moderate depression, Dr. Kaplan stated that "he [Dr. Nelson] says recurrent, so obviously he's not saying it was a chronic major depression that lasts for years." (R. 346.) Rather, Dr. Kaplan believed, based on Plaintiff's changes in mood and scores on the psychological tests, "what we have here is a lady who attempts to magnify her problem." (R. 337.) Dr. Kaplan also concluded that Plaintiff did not suffer from a somatoform disorder but that such a disorder was "a possibility." (R. 351-352.) He testified that she would have occasional problems with concentration, but that she would be able to do simple work. (R. 342, 350.) When asked by Plaintiff's attorney whether Plaintiff would have problems concentrating in a simple but very repetitive job over the length of a day, Dr. Kaplan declined to testify specifically. (R. 350-351.)

As the ALJ observed, Plaintiff's explanations of her substance use have not been "fully consistent." (R. 18.) At her September 1999 hearing Plaintiff testified that she only once used cocaine two or three years prior and that she last smoked marijuana in the late 1980's. (R. 322, 325.) In her 1995 drug and alcohol questionnaire, Plaintiff stated she wasis not using drugs. (R. 510.) However, the social history section of a 1996 Holy Cross Emergency room report listed "positive cocaine abuse" with Plaintiff's last use being approximately three days prior. (R. 619.) In 1997,

---

[29]The signature is partially illegible but he is so identified by Plaintiff. (R. 111.)

Plaintiff reported to Dr. Langgut that she had a history of use of marijuana and cocaine but stated that she was not currently using either. (R. 728.) Also in 1997, she reported to Dr. Nelson that she had been drug free since "about 1973." (R. 732.) Plaintiff's history of alcohol use is equally inconsistent. In her drug and alcohol questionnaire Plaintiff stated that she began drinking beer in 1956 (when she was three years old) because her mother felt it would put her to sleep. (R. 510.) She stated that she currently drank beer and wine, but did not binge drink, black out or have difficulty recovering. (*Id.*) In the August, 1999 hearing Plaintiff testified that she drank wine and a total of one or two six packs a month with friends. (R. 288.) Plaintiff reported to Dr. Langgut that she stopped drinking in 1997 after drinking regularly every weekend from age eighteen or nineteen. (R. 728.) Plaintiff reported to Dr. Nelson that she began drinking at age thirty-two and was, in Dr. Nelson's words a "moderate to heavy daily drinker for a number of years." (R. 732.) She stated that as of 1997, she drank once or twice a week. (*Id.*) Plaintiff reported to Dr. Bridgeforth in 1997 that she drank a six pack a week. (R. 736.) She made the same report to Dr. Shermer. (R. 785.) In 1994, she passed out and was taken to the Holy Cross Emergency Room which indicated acute alcohol intoxification. (R. 624.)

## C. TESTIMONY OF THE VOCATIONAL EXPERT

Richard John Hamerson testified as a vocational expert ("VE") at the September, 1999 hearing. (R. 355-360.) The ALJ posed a hypothetical question assuming a person with an ability to lift 20 pounds rarely, up to 10 pounds frequently, who could walk or stand for a combined total of up to four hours in a work day, and can sit for up to six hours and up to two hours at a time, but could not perform repetitive foot controls or climb ladders. (R. 356.) The VE testified that there

were jobs in the light level that would offer a sit/stand option, such as a cashier. (*Id.*) Jobs such as a cashier, receptionist or hand packager would also be possible at the sedentary, unskilled level. (R. 357.) The VE testified that his opinion would be the same if the person were moderately limited in the ability to carry out complex or detailed instruction, and also moderately limited in the ability to sit or stand and in concentration and attention. (*Id.*) In addition he testified that if the person were off task outside of break time for less than five percent of the work day, his opinion would not change. (R. 357-358.) However, he also testified that all jobs would be precluded if Plaintiff was distracted by feelings of pain or depression or unable to concentrate for more than five percent of her workday. (R. 358.)

## STANDARD OF REVIEW

The Social Security Act provides for limited judicial review of a final decision of the Commissioner (effectively that of the ALJ where, as here, the Appeals Council has denied the applicant's request for review). Where the ALJ commits an error of law, "reversal is required without regard to the volume of the evidence in support of the factual findings." *Imani v. Heckler*, 797 F.2d 508, 510 (7th Cir. 1986). With respect to the ALJ's conclusions of fact, the reviewing court's role is limited. There, the role of the district court is only to determine whether the decision of the ALJ is supported by substantial evidence in the record. *Wolfe v. Shalala*, 997 F.2d 321, 322 (7th Cir. 1993). In reviewing the Commissioner's decision, the court may not decide facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994); *Brown v. Chater*, 913 F.Supp. 1210, 1213-14 (N.D. Ill. 1996)(Bucklo, J.). Thus, the court does "not substitute [its] own judgment for that of the ALJ."

*Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997). Rather, the court must affirm a decision if it is supported by substantial evidence and the ALJ has made no error of law. *Herr v. Sullivan*, 912 F.2d 178, 180 (7th Cir. 1990); *Edwards v. Sullivan*, 985 F.2d 334, 336-37 (7th Cir. 1993). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

When evaluating a disability claim the ALJ must consider all relevant evidence and may not select and discuss only that evidence that favors his ultimate conclusion. *Herron*, 19 F.3d at 333. Where conflicting evidence allows reasonable minds to differ, the responsibility for resolving the conflict falls on the ALJ, not the court. *Herr*, 912 F.2d at 181; *See also Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989)(holding the ALJ has the authority to assess medical evidence and give greater weight to that which he finds more credible). Where there is a conflict between medical opinions, the ALJ may choose between those opinions but may not substitute his own lay opinion for that of the medical professionals. *Davis v. Chater*, 952 F.Supp. 561, 566 (N.D. Ill. 1996)(Keys, M.J.). A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record. 20 C.F.R. § 416.927(d)(2).

Although the district court's role is limited to determining whether the ALJ's final decision is supported by substantial evidence and based upon proper legal criteria, this does not mean that the ALJ is entitled to unlimited judicial deference. In addition to relying on substantial evidence, the ALJ must articulate his analysis at some minimal level and state his reasons for accepting or rejecting "entire lines of evidence," although he need not evaluate in writing every piece of evidence

15

in the record. *See Herron*, 19 F.3d at 333; *see also, Young v. Sec'y. of Health and Human Servs.*, 957 F.2d 386, 393 (7th Cir. 1992)(ALJ must articulate his reason for rejecting evidence "within reasonable limits" in order to allow for meaningful appellate review); *Guercio v. Shalala*, No. 93-C-323, 1994 WL 66102 at *9 (N.D. Ill. March 3, 1994)(Marovich, J.)(ALJ need not spell out every step in his reasoning, provided he has given sufficient direction that the full course of his decision may be discerned)(citing *Brown v. Bowen*, 847 F.2d 342, 346 (7th Cir. 1988)). Conflicting factual determinations in an ALJ's opinion "require remand." *Smith v. Massanari*, No. 00-C-7504, 2001 WL 936123 at *1-2 (N.D. Ill Aug. 16, 2001)(Shadur, J.).

## ALJ'S DECISION

Following the second round of hearings in 1999, the ALJ then presiding concluded that Plaintiff, while unable to perform her prior job as a nurse's aid, was able to perform a limited range of light work and close to the full range of sedentary unskilled work and, thus, was not disabled as defined by the Social Security Act. (R. 28.)

The Social Security Regulations ("Regulations") prescribe a sequential five-part test for determining whether a claimant is disabled. 20 C.F.R. § 416.920. The Social Security Commissioner must consider: (1) whether the claimant has performed substantial gainful activity during the period for which he claims disability; (2) if he has not performed any substantial gainful activity, whether the claimant has a severe impairment or combination of impairments; (3) if the claimant has a severe impairment, whether the claimant's impairment meets or equals any impairment listed in the Regulations as being so severe as to preclude substantial gainful activity; (4) if the impairment does not meet or equal a listed impairment, whether the claimant retains the residual functional capacity,

despite his impairment, to perform his past relevant work; and (5) if the claimant cannot perform his past relevant work, whether the claimant is able to perform any other work existing in significant numbers in the national economy, considering his residual functional capacity together with his age, education, and work experience. *Id.* The claimant bears the burden of proof at steps one through four, after which the burden shifts to the Commissioner at step five. *Id.*

In reaching her decision, the ALJ first considered whether Plaintiff was performing substantial gainful activity. The ALJ found that Plaintiff's testimony regarding her current work activities was "vague and somewhat inconsistent" and that Plaintiff had performed significant work since her alleged onset date. (R. 16.) However the ALJ found that, given the record, she was unable to determine that Plaintiff had performed disqualifying substantial gainful activity and declined to secure additional evidence on this issue given her finding that Plaintiff was not disabled. *(Id.)*

The ALJ then considered whether Plaintiff had a severe impairment. She found that Plaintiff's back pain was a severe impairment because it put at least minimal and occasional restrictions on her ability to work. *(Id.)* Having found that Plaintiff had a severe impairment, the ALJ stated that she would not discuss Plaintiff's other impairments at this step. *(Id.)*

At step three, the ALJ considered whether Plaintiff's impairments met or equaled the criteria for a listed impairment under 20 C.F.R. Part 40, Subpart P, Appx. 1. Listing 1.04(c), covering disorders of the spine, including degenerative disc disease, requires one of three conditions:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, a positive straight-leg raising test (sitting and

supine); or B. Spinal arachnoiditis[30] confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifest by severe burning and painful dysesthesia resulting in the need for changes in position or posture more than once every two hours; or C. Lumbar spinal stenosis[31] resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness and resulting in inability to ambulate effectively as defined in 100B2b.

The ALJ found that Plaintiff did not suffer from a listing-level spinal impairment because Plaintiff's strength, range of motion, reflex and sensation were not impaired at the listing levels. (R. 17.) In addition the ALJ found that Plaintiff lacked any other listing-level physical impairments. (*Id.*) Finally, the ALJ agreed with Dr. Kaplan and Dr. Langgut that Plaintiff did not suffer from a listing-level mental or emotional impairment. (R. 20.) The ALJ also discussed Plaintiff's substance abuse. The Social Security Act provides that a person shall not be considered disabled if drug addiction or alcoholism is a contributing factor material to the determination that an individual is disabled. 42 U.S.C.A. § 1382c (a)(3)(J); 416.935. Because the ALJ did not find that Plaintiff is disabled, the ALJ did not reach that issue.

In evaluating Plaintiff's RFC, the ALJ extensively reviewed Plaintiff's medical history. (R. 21-24.) In light of that history, the ALJ found Plaintiff's testimony regarding her symptoms to be not fully credible. (R. 25.) The ALJ found that Plaintiff's testimony conflicted with the available medical evidence, that her attempts at treatment had been sporadic, and that she had reported improvement to her treating doctors, contradicting her testimony at the hearing. (*Id.*) The ALJ also noted that some of Plaintiff's activities, such as after school babysitting, were inconsistent with the

---

[30]Spinal arachnoiditis is the inflamation of that portion of the arachnoid membrane that surrounds the spinal cord and other areas within the vertebral canal. *Id.* at 119.

[31]Stenosis is the narrowing of a canal or orifice. *Stedman's* at 1695.

pain and depression she described. (*Id.*) The ALJ then found that Plaintiff had the ability to do some work at the sedentary to light levels, with some restrictions such as avoiding ladders and unguarded machinery. (R. 25-26.) The ALJ found that Plaintiff could remain seated for six hours out of an eight hour day. (R. 26. ) The ALJ found Plaintiff could sit for two hours uninterrupted and resume sitting after a five minute break. (*Id.*) In addition, the ALJ found that Plaintiff's "pain, depression and other subjective symptoms" would interfere with Plaintiff's productivity less than five percent of a work day, outside of ordinary breaks. (*Id.*)

At step four, the ALJ found that the record did not establish that Plaintiff had engaged in past relevant work. (*Id.*) At step five, the ALJ found that the SSA had met its burden to show that Plaintiff was able to perform work that exists in significant numbers. (R. 26-27.) She noted that the Medical-Vocational Guidelines ("Grids") would dictate a finding of not disabled if Plaintiff could perform the full range of sedentary work, but here Plaintiff had other exertional and non-exertional limitations that impeded the full range of sedentary work. (R. 27.) The ALJ determined, however, based on the testimony of the VE, and using the Grids as a framework, that work consistent with Plaintiff's abilities exists in significant numbers in the economy. (R. 27-8.)

The ALJ attached a standardized form to her opinion in which she found that Plaintiff would "often" have deficiencies of "concentration, persistence or pace." (R. 33.) This form is titled Summary Review Report but referred to as a Psychiatric Review Technique Form ("PRTF") in the ALJ's opinion. (R. 29, 15.)

## DISCUSSION

Plaintiff raises three issues in her motion for summary judgment, which are discussed in turn.

## A. INTERNAL INCONSISTENCY IN THE ALJ'S OPINION

Plaintiff argues that the ALJ's finding reflected in the PRTF that Plaintiff would "often" have deficiencies of "concentration, persistence or pace" is inconsistent with the ALJ's finding that Plaintiff's symptoms would not interfere with her work ability for more than five percent of a work day. (R. 33, 26.) The latter finding is particularly significant because the five percent figure was apparently a cut-off point for the VE. The VE testified that if Plaintiff were off task for more than five percent of the workday, outside of regular breaks, there would be no jobs that she could perform given her other restrictions. (R. 357-358.) As discussed above, Dr. Spriegel also evaluated Plaintiff as "often" having deficiencies in concentration, persistence or pace. (R. 749.)

At the time the ALJ rendered her opinion, the applicable regulations governing evaluation of mental impairments required the ALJ to record her findings regarding the degree of functional loss by preparing a standard document, the PTRF.[32] The degree of functional loss in the area of concentration, persistence or pace was to be evaluated on a five point scale (never, seldom, often, frequent, constant). 20 C.F.R. § 416.920a(b)(3). The last two points on that scale represented a degree of limitation which is incompatible with the ability to perform the work-related function. *Id.*[33] Plaintiff argues that, although a rating of "often" was not assigned a presumption of

---

[32]20 C.F.R. § 416.920a(d) (effective until September 20, 2000) provided:

A standard document outlining the steps of this procedure must be completed by us in each case at the initial, reconsideration, administrative law judge hearing, and Appeals Council levels (when the Appeals Council issues a decision.)

[33]The SSA revised 20 C.F.R. § 416.920a (and its counterpart for Disability Insurance Benefits, 20 C.F.R. § 404.1520a), effective September 20, 2000. 65 Fed. Reg. 50746 (August 21, 2000). Under the new procedures, limitations in the functional area of concentration, persistence

disability, the rating of "often," located at the middle of the scale, appears intuitively inconsistent with a value of less than five percent.

The meaning of the term "often" as used in the PRTF was considered at length by the court in *Bankston v. Comm'r. of Social Security*, 127 F. Supp. 2d 820, 825-27 (E.D. Mich. 2000). In that case it was conceded that the Social Security regulations, rulings and case opinions provide no clear definition of the word "often." *Id.* at 826. After reviewing the regulations and certain case law from the Sixth Circuit, the court concluded that a "reasonable interpretation of the word 'often' as used in the PRTF" was that advocated by the plaintiff in that case:

> The levels of concentration impairment on the PRTF and in 20 C.F.R. § 1520a(b)(3) are clearly divided into five separate categories: Never, Seldom, Often, Frequent and Constant. "Never" is obviously 0% of the time and "Constant," for purposes of this definition, is 100% of the time. Logic supports the conclusion that the other categories be divided equally be corresponding time factors which then give a range of concentration impairment. Thus, "Never = 0, "Seldom"= 25%, "Often" = 50%, "Frequent"= 75%, Constant" =100%.

*Id.* at 827. The court went on to hold that the plaintiff in that case, who often had deficiencies of concentration, persistence or pace, was precluded from performing even sedentary work and was disabled under the Social Security Act. *Id.* The court reversed with instructions to the Commissioner to award the plaintiff benefits. *Id.*

The *Bankston* case is not binding on this Court, and this opinion should not be read to mean that this Court is adopting the interpretation of the PRTF categories used by the court in *Bankston*. However, the *Bankston* decision clearly supports Plaintiff's position here that there is an inherent inconsistency between the ALJ's finding that Plaintiff would "often" have deficiencies of

---

or pace are rated on different five point scale: None, mild, moderate, marked and extreme. 20 C.F.R. § 416.920a(c)(4). On that scale, the last point represents a degree of limitation that is incompatible with the ability to do any gainful activity. *Id.*

"concentration, persistence or pace" and the ALJ's finding that Plaintiff's symptoms would not interfere with her work ability for more than five percent of a work day. Furthermore, Plaintiff's argument is also supported by a commonsense interpretation of the term "often" and its position in the middle of the scale just below the levels of presumptive disability.

The PRTF states, "Items 3 [relating to concentration, persistence or pace] and 4 below are more than measures of frequency. Duration and effects of the deficiencies (Item 3) or episodes (Item 4) are discussed in the decision." (R. 32.) However, the ALJ does not expressly discuss in the opinion her finding that the Plaintiff suffered deficiencies in concentration, persistence or pace "often" or how that finding is consistent with a finding that Plaintiff would be off-task less than a five percent of the workday.

Inconsistent findings by the ALJ require remand. *Peterson v. Chater*, 96 F. 3d 1015,1016 (7th Cir. 1996). Thus, this case must be remanded for the ALJ to resolve the apparent contradiction.


## B. THE ALJ'S FINDING THAT PLAINTIFF COULD REMAIN SEATED FOR UP TO TWO HOURS

Plaintiff argues that the ALJ's finding that Plaintiff could sit for up to six hours out of an eight hour day and remain seated for two hours with only five minute breaks is inconsistent with the evidence and fails to consider the opinions of Plaintiff's treating sources. (R. 26.) Plaintiff points to three entries in the medical records. (Pl.'s Mem. Supp. Mot. Summ. J. at 11.) First, treating physician Dr. Ekwuome wrote a note in June, 1996 stating that plaintiff "is physically unable to sit for long periods of time in one place due to severe low back pain from lumber disc disease and arthritis." (R. 634.) The Commissioner discounts that note because it reflects that it was written at Plaintiff's request. (Def.'s Mem. Supp. Mot. Summ. J. at 13.) However, presumably, Dr. Ekwuome

would not have written and signed the note if it did not reflect her opinion. The second entry to

which Plaintiff points is an entry by the outpatient physical therapy staff at Provident Hospital in

February, 1996 stating that "patient can tolerate sitting position for some time." (R. 637.) On the

whole, that entry reflects progress on Plaintiff's part as a result of the physical therapy: "Reported

[increase] in functional use of back. . . . No longer bends forward while sitting in effort to [reduce]

pain in low back–compensating." (*Id.*) The third entry is a report from Dr. Thapedi in February,

1997 of an office visit for neurological consultation. (R. 766-67.) The relevant part of the report

states:

> For the past three years, she [Plaintiff] has been experiencing persistent, constant low
> back pain with periodic radiation into both hips and sometimes into both legs,
> sometimes with associated paresthesia in the legs. The pain is aggravated by
> prolonged same postures such as sitting or standing and sometimes by coughing or
> sneezing. She experiences transient improvement with position change, and she has
> noticed some improvement with the use of her vibrating pillow placed under her
> back.

(R. 766.) Dr. Thapedi apparently restated the symptoms reported to him by Plaintiff, but did not

discount those reports.

The ALJ is required to consider the opinions of treating physicians and the opinion of a

treating physician on the nature and severity of the claimant's impairments must be given controlling

weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques

and is not inconsistent with the other substantial evidence in the record. 20 C.F.R. § 416.927(d)(2).

However, the weight to be given a treating physician's opinion depends on "the extent to which it

is supported by specific and complete clinical findings." *Searles v. Bowen*, No. 85-C-1816, 1989 WL

280373 at *12 (N.D. Ill. Apr. 18, 1989)(Nordberg, J.).

Here, the ALJ's opinion documents her careful review of Plaintiff's medical history relating

to her back pain. (R. 21-24.) She expressly considered Dr. Ekwuome's June, 1997 note, and concluded that the finding that Plaintiff could sit for up to two hours was not inconsistent with Dr. Ekwuome's opinion that Plaintiff cannot remain seated for prolonged periods without a break. (R. 24-25.)

Contrary to Plaintiff's argument, none of the three entries is inconsistent with the finding that Plaintiff could sit for up to two hours. (R. 26.) None of the treating sources quantified a period of time that Plaintiff could sit. Dr. Newman, the medical expert who testified regarding Plaintiff's back impairment, opined that two hours would be the maximum that Plaintiff could sit at one time. (R. 333.) The ALJ accepted that opinion and incorporated it into her findings and the hypothetical question to the VE. Significantly, the ALJ elected to give greater weight to Dr. Newman's opinion that Plaintiff was capable of sedentary to light work than to the opinion of the non-testifying DDS doctors that Plaintiff was capable of medium work because Dr. Newman had "better access to . . . [Plaintiff's] medical records and the opportunity to observe and question" Plaintiff. (R. 24.)

The ALJ's finding was not inconsistent with the opinions of treating sources and was supported by substantial evidence.

## C.  IDENTIFICATION OF SEVERE IMPAIRMENTS

Plaintiff challenges the ALJ's finding at step two. Plaintiff argues that the ALJ was required to state specifically whether each of Plaintiff's impairments was or was not "severe." Plaintiff also argues that the ALJ's finding contained an error of fact warranting reversal.

In her sequential analysis, the ALJ declined to identify the severity of Plaintiff's complaints other than back pain. (R. 16.) The ALJ is not required to make a specific finding of severity as to all

of Plaintiff's complaints. Severity "is nothing more than an administrative convenience" to dispose of groundless claims. *Lopez v. Sullivan*, No. 92-C-2828, 1993 WL 6641 at *7-8 (N.D. Ill. Jan. 8, 1993)(Shadur, J.). If benefits are not denied at step two, the ALJ goes on to evaluate the claimant's ability to work given the totality of her impairments. Thus, as long as the ALJ proceeds beyond step two, no error can result from that analysis. *Id*; *Leeper v. Sullivan*, No. 88-C-6626, 1990 WL 77874 at *2 n.4 (N.D. Ill. May 21, 1990.)(Moran, J.).

Plaintiff argues in particular that the ALJ failed to consider the evidence of Plaintiff's claimed personality disorder in her subsequent analysis. In 1997, consulting psychiatrist Dr. Nelson examined Plaintiff and diagnosed "major depression, recurrent," "personality disorder, NOS, history of chronic alcoholism" and "past history of marijuana abuse." (R. 734.) Plaintiff claims that the ALJ erred in failing to indicate that diagnosis of personality disorder in the PRFT form at section III, which asks for "documentation of factors that evidence the disorder." In that section, the ALJ had the choice of listing "present" or "absent" for a number of listings. Regarding listing 12.08, "personality disorders," the ALJ marked "absent." (R. 29.) Plaintiff argues that that notation constitutes a statement by the ALJ that there is no documentation of such a disorder. (Pl.'s Reply Mem. at 8.) However, Plaintiff's argument fails to consider the section of the PRFT form dealing with "Substance Addiction Disorders." (R. 32.) In that section, which documents "behavioral changes or physical changes associated with the regular use of substances that affect the central nervous system," the ALJ marked both "Listing 12.04 - affective disorders" and "Listing 12.08 - Personality disorders." (*Id.*) That analysis is consistent with Dr. Nelson's evaluation, which reports Plaintiff's chronic alcoholism and marijuana use. (R. 731-735.) It is also supported by other evidence in the record of Plaintiff's substance abuse, discussed by the ALJ. (R. 18-19.)

Furthermore, the ALJ discussed Dr. Nelson's diagnoses, including the diagnosis of personality disorder, in the opinion and discussed in detail why the evidence did not support a finding of listing-level mental impairment. (R. 18-20.)

As discussed above, as long as the ALJ's finding is supported by substantial evidence, it is not the role of the court to reweigh the evidence. The ALJ did not ignore Dr. Nelson's finding. Her decision to conclude that any evidence of a personality disorder was attributable to Plaintiff's substance abuse was supported by substantial evidence.

## CONCLUSION

The ALJ's opinion in this case is exceptionally thorough, as even Plaintiff acknowledges. (Pl.'s Mem. Supp. Mot. Summ. J. at 9.) However, it contains an inconsistent finding regarding Plaintiff's deficiencies in concentration, persistence and pace, and must be remanded for clarification of that issue. Defendant's motion for summary judgment is DENIED. Plaintiff's motion for summary judgment is GRANTED, and the case is remanded to the Commissioner for proceedings consistent with this opinion.

**IT IS SO ORDERED.**

**GERALDINE SOAT BROWN**
**United States Magistrate Judge**

**DATED:  February 21, 2003**